800 P.2d 590

**Dan Richmond SLAYTON, Plaintiff/Appellant,**

**v.**

**Jim SHUMWAY, Secretary of State of the State of Arizona, Defendant/Appellee,**

**Donna Pickering and Victims' Bill of Rights Task Force, Intervenors/Appellees.**

**No. CV–90–0356–AP.**

Supreme Court of Arizona, En banc.

Nov. 6, 1990.

Michael J. Bloom, P.C. by Michael J. Bloom, Tucson, Patterson & Terribile by Michael Terribile and Feder Law Office, P.A. by Bruce S. Feder, Phoenix, for plaintiff/appellant.

Robert K. Corbin, Atty. Gen. by Anthony B. Ching, Sol. Gen., Phoenix, for defendant/appellee.

Meyer, Hendricks, Victor, Osborn & Maledon, P.A. by Donald M. Peters, Phoenix, for intervenors/appellees.

## OPINION

FELDMAN, Vice Chief Justice.

This is an appeal from a judgment dismissing a suit brought by Dan Richmond Slayton (Slayton) to enjoin Jim Shumway, the Secretary of State (Shumway), from certifying and printing an initiative measure on the official ballot. The initiative is designated as Proposition 104, a proposed constitutional amendment popularly known as the Victims' Rights Initiative.

We have jurisdiction for this direct appeal under article 6, § 5(1) of the Arizona Constitution and A.R.S. § 19–122(C).

## FACTS

On August 29, 1990, Slayton filed suit in the Maricopa County Superior Court seeking declarative and injunctive relief "prohibiting [Shumway] from certifying and printing on the official ballot for the [November] general election the proposed constitutional amendment" known as Proposition 104. Complaint, para. VII. Slayton alleged standing to bring the action as a citizen of the state and registered voter.

A motion to intervene was filed by the Victims' Bill of Rights Task Force and its chairperson, Donna Pickering (collectively the Task Force). The Task Force alleged it was a "campaign committee" that had worked to get Proposition 104 on the ballot and was working for its passage. On stipulation, the court allowed intervention.

There is only one issue before us. Slayton argues that Proposition 104 violates the single subject rule of the Arizona Constitution, which provides that:

> If more than one proposed [constitutional] amendment shall be submitted in any election, such proposed amendment shall be submitted in such a manner that the electors may vote for or against each proposed amendment separately.

Ariz. Const. art. 21, § 1.

The proposed initiative measure would amend the Arizona Constitution by including a victims' bill of rights.[1] The operative portion, article 2, § 2.1(A), contains eleven subsections. Subsections 1 through 10 enumerate certain procedural protections to, and rights of, those who are victims of crime. Eight of these are similar to the protections and rights already contained in our Rules of Criminal Procedure. *See* Rule 39, Ariz.R.Crim.P., 17 A.R.S. Slayton acknowledges that the first ten subsections are so interrelated that together they form a single subject "properly presented to the voters in the single package of Proposition 104." Appellant's Opening Brief at 3.

Slayton argues, however, that subsection 11, which deals with the rulemaking authority, is not sufficiently related to the first ten subsections and therefore violates the single subject rule. Slayton contends that, unlike the first ten subsections, subsection 11 addresses neither the substan-

---

1. See appendix for complete text of the initiative proposal.

tive nor procedural rights of victims. Instead, "without warning," it transfers the ultimate authority over " '*all* rules governing criminal procedure and the admissibility of evidence in *all* criminal proceedings' from the Arizona Supreme Court to the Arizona state legislature." *Id.* at 3 (quoting Proposition 104, subsection 11) (emphasis Slayton's). Pointing out that article 6, § 5(5) of the Arizona Constitution presently gives this court exclusive authority to enact procedural rules, Slayton argues that the rulemaking provision in Proposition 104 is "radically different" from the provisions giving victims procedural rights and protections, thus violating article 21, § 1.

Advancing these same contentions in the trial court, Slayton moved for summary judgment on the complaint. The Task Force filed a motion for judgment on the pleadings. *See* Rule 12(c), Ariz.R.Civ.P., 16 A.R.S. Expediting its decision, on September 11, 1990 the trial court granted the Task Force's motion, denied Slayton's, and entered a judgment dismissing the complaint. Slayton appealed, we ordered expedited briefing, and, following oral argument, entered an order on September 20, 1990 that "the judgment of the Maricopa County Superior Court is affirmed. An opinion will follow." This is that opinion.

## DISCUSSION

The Arizona Constitution presently gives this court exclusive and broad procedural rulemaking authority in all cases, criminal and civil. The words used are as follows:

§ 5. **Supreme court; jurisdiction; writs; rules; habeas corpus**

The Supreme Court shall have:

\*　　\*　　\*　　\*　　\*　　\*

5. Power to make rules relative to all procedural matters in any court.

Ariz. Const. art. 6, § 5(5). The rulemaking power is exclusive. *See State ex rel. Collins v. Seidel,* 142 Ariz. 587, 691 P.2d 678 (1984). It includes formulation of evidentiary rules. *Barsema v. Susong,* 156 Ariz. 309, 751 P.2d 969 (1988).

Section 2.1(A)(11) of the proposed amendment would change the existing regime by providing that

a victim of crime has a right:

\*　　\*　　\*　　\*　　\*　　\*

11. to have all rules governing criminal procedure and the admissibility of evidence in all criminal proceedings protect victims' rights and to have these rules be subject to amendment or repeal by the legislature to ensure the protection of these rights.

The language, of course, is both broad ("all rules governing criminal procedure and the admissibility of evidence") and somewhat unclear in failing to specify or limit the extent of the transfer of rulemaking power. Slayton reads the provision broadly, as giving the legislature the right to amend or repeal *all* procedural and evidentiary rules in *all* criminal cases.

Starting from that broad interpretation, Slayton contends that the effect of subsection 11 is to transfer the ultimate rulemaking authority in criminal cases from this court to the legislature. This, Slayton argues, goes far beyond the procedural rights of victims enumerated in subsections 1 through 10 and completely changes the allocation of rulemaking authority, including the great majority of matters that do not deal with victims' rights.

The transfer of ultimate rulemaking authority in all criminal proceedings from the court to the legislature is indeed a radical departure from our practice. *See Conway v. Superior Court,* 60 Ariz. 69, 131 P.2d 983 (1942) [2] (court had inherent rulemaking authority prior to explicit grant in constitution), and the explicit provisions of the so-called Model Courts Amendment of 1960, adopting article 6, § 5(5) of the Arizona Constitution. If Slayton's proposed interpretation is correct, then it must be conceded that subsection 11, which would transfer rulemaking authority for matters that have nothing to do with victims' rights, is much broader than and quite dissimilar to subsections 1 through 10.

---

**2.** Overruled in other part by *Adams v. Bolin,* 74 Ariz. 269, 275, 247 P.2d 617, 621 (1952).

■ Our previous cases have adopted a single subject rule that prevents the "pernicious practice of 'log-rolling'" whereby dissimilar provisions are combined in a single proposition "so that voters must vote for or against the whole package even though they would have voted differently had the propositions been submitted separately." *Tilson v. Mofford*, 153 Ariz. 468, 471, 737 P.2d 1367, 1370 (1987) (quoting *Kerby v. Luhrs*, 44 Ariz. 208, 214, 36 P.2d 549, 551 (1934)).

The single subject rule has important substantive purposes. It prevents two minority groups from combining different proposals—and thus their votes—to obtain a majority in favor of the joint proposal when neither standing alone could achieve such a majority. *See Kerby*, 44 Ariz. at 214, 36 P.2d at 552; Ruud, *No Law Shall Embrace More Than One Subject*, 42 MINN.L.REV. 389, 391 (1958). The rule further prevents those who propose initiatives from confusing or deceiving the voters by inserting unrelated provisions in an initiative proposal and "hiding them" from the voters. *See California Trial Lawyers Ass'n, Inc. v. March Fong Eu*, 200 Cal. App.3d 351, 358–362, 245 Cal.Rptr. 916, 920–22 (1988) (single subject rule violated by inserting two brief paragraphs addressing campaign contributions and conflicts of interest in the middle of a 120–page initiative proposal pertaining to tort reform).

In *Kerby*, we invoked the provisions of article 21, § 1 to enjoin the submission of an amendment that proposed formulae for the taxation of copper mines and public utility corporations, and also proposed the establishment of a tax commission as a constitutional body. Noting that the facially unrelated provisions of the amendment were connected only by virtue of embracing the broad, general subject matter of taxation, we stated the following test for the single subject rule:

Taking into consideration all of the cases cited, it is apparent to us that they agree in substance upon the principle to be used as a test [for violation of the single subject rule], but differ widely as to the result reached in its application to particular cases. We think that princi-

ple, as explained by the cases from which we have quoted, may be restated as follows:

If the different changes contained in the proposed amendments all cover matters necessary to be dealt with in some manner, in order that the Constitution, as amended, shall constitute a *consistent and workable whole on the general topic embraced in that part which is amended,* and if, *logically speaking, they should stand or fall as a whole,* then there is but one amendment submitted. But, if any of the propositions, although not directly contradicting the others, does not refer to such matters, *or if it is not such that the voters supporting it would reasonably be expected to support the principle of the others,* then there are in reality two or more amendments to be submitted, and the proposed constitutional amendments fall within the constitutional prohibition [of article 21, § 1].

*Kerby*, 44 Ariz. at 221, 36 P.2d at 554 (emphasis added).

We are aware that other states have evolved less restrictive formulations. *See, e.g., Brosnahan v. Brown*, 32 Cal.3d 236, 253, 651 P.2d 274, 284, 186 Cal.Rptr. 30, 40 (1982) (adopting a "liberal interpretive tradition ... of sustaining statutes and initiatives which fairly disclose a reasonable and common sense relationship among their various components in furtherance of a common purpose"). In *Coalition for Political Honesty v. State Board of Elections*, 83 Ill.2d 236, 47 Ill.Dec. 363, 415 N.E.2d 368 (Ill.1981), the Illinois Supreme Court adopted a "reasonable, workable relationship" test, rejecting a proposed application of *Kerby*'s requirement that voters favoring one provision would reasonably be expected to favor the principle of the others. The court based its reasoning in part on its view that *Kerby* was later qualified by *State ex rel. Jones v. Lockhart*, 76 Ariz. 390, 265 P.2d 447 (1953).

We believe the Illinois court misinterpreted *Lockhart*. As Justice Ryan correctly pointed out in his dissent from the Illinois

opinion,[3] *Lockhart* approves the portion of *Kerby* quoted above. *Coalition,* 47 Ill. Dec. at 382, 415 N.E.2d at 387 (Ryan, J., dissenting) (quoting *Lockhart,* 76 Ariz. at 396, 265 P.2d at 451). In holding that a proposal to change the constitutional provisions pertaining to the number of senators representing each county in the state could be combined with a proposal to change representation and apportionment in the house of representatives, *Lockhart* held that the two provisions

> relate to, and are germane to, one general subject, *i.e.,* the composition of state legislature, and historically the people of this state have considered that but one subject was involved, to wit: 'The Legislature,' albeit that legislature is bicameral. We cannot say that the people of this state in dealing with this subject for the past forty years have erred and acted unreasonably in treating their legislature as a single subject in constitutional amendments. We hold that but one proposed amendment was submitted....

*Lockhart,* 76 Ariz. at 397, 265 P.2d at 452.

We do not believe those words overrule the *Kerby* test. Whether the separate portions of a proposed amendment relate to and are germane to one general subject is certainly part of determining whether they must stand or fall together. Further, contrary to the views of the Illinois court, *Kerby* does not require a finding that all voters would be certain to vote for or against each of the portions of the proposal. Obviously a proposal could seldom attract such unanimity of support to each of its parts.

What *Kerby* requires is simply that "logically speaking, [the different portions] should stand or fall as a whole" because the voters "supporting [each portion] would reasonably be expected to support the principle of the others." *Kerby,* 44 Ariz. at 221, 36 P.2d at 554. Such a requirement does much to eliminate or at least reduce the dangers at which article 21, § 1 was aimed and, hopefully, also reduces the influence of "experts" in the business of "selling" proposals to the people through modern advertising campaigns. There is a difference between selling soap and amending the constitution; we believe we should try to maintain that difference. Thus, we hold that *Kerby* sets forth the proper test. We adverted to it most recently in *Tilson,* 153 Ariz. at 471–72, 737 P.2d at 1370–71.

■ Applying these legal principles to the case before us requires some interpretation of the proposed initiative. If it transfers power to make all procedural and evidentiary rules in all criminal cases from this court to the legislature, we believe the proposal would violate the single subject rule. There are several reasons for this: to begin with, subsections 1 through 10 of Proposition 104 deal only with procedural rights of victims involved in the criminal justice system. The rulemaking power, however, is not a procedural question at all. The power to make rules is a substantive question involving the separation of powers. *Conway,* 60 Ariz. at 79–81, 131 P.2d at 987–88. Courts have inherent power, even absent explicit constitutional provision or legislative consent, to formulate their own procedural rules. *Id.* at 79, 131 P.2d at 987. Thus, if broadly construed, the rulemaking provision of subsection 11 is a separation of powers provision that goes far beyond victims' concerns and therefore does not pertain to the same subject as the rights provisions of the proposal.

Further, there is no reason suggested, nor any we could imagine, that voters supporting the victims' rights enumerated in Proposition 104 would naturally or reasonably be expected to support the principle that the traditional separation of powers in the state is to be changed to vest the legislature with the entire rulemaking power for all criminal cases. We recognize that the legislature and the judiciary may disagree on certain rule provisions pertaining to criminal cases. However, it is simply impossible to conclude that as a matter

---

**3.** Chief Justice Goldenhirsh joined Justice Ryan's dissent from the majority's per curiam opinion.

of history or tradition transferring to the legislature all rulemaking power in all criminal cases is so connected to the ten enumerated rights of victims in the proposal that voters would reasonably be expected to vote for subsection 11 if they agreed with the first ten. In fact, informed voters might well favor the enumerated rights contained in subsections 1 through 10 yet vehemently oppose destroying the separation of powers. Given that this country was founded on the theory that freedom is best preserved by separating the powers of government, it is reasonable to conclude that voters who support the principles of victims' rights would not also support overthrowing the principle that the judicial branch of government should keep its own house with regard to procedural and evidentiary rules. Considering the emphasis the founders of this state placed on the separation of powers, *see* Ariz. Const. art. 3, we believe this to be the proper conclusion.

If, therefore, Slayton's interpretation of subsection 11 were correct, we would be constrained to find a violation of the single subject rule. Perhaps in recognition of this, however, the Task Force disagrees strongly with Slayton's reading. Brief of Intervenor–Appellees at 11. The Task Force's interpretation of its own proposition is much narrower than Slayton's.

The Task Force submits that "proposition 104 does not amend article 6[5]." *Id.* at 13. Acknowledging some ambiguity in the language of subsection 11, it contends article 2, § 2.1(A)(11) of the initiative should be "construed to mean the legislature will have the power to amend or repeal rules [only] for the limited purpose of protecting victims' rights." *Id.* Such a construction would obviate the "difficult [constitutional] questions [that] might [otherwise] arise." *Id.* Thus, the Task Force submits that the legislative authority granted by subsection 11 "extends only as far as necessary to protect ... rights created by the rest of proposition 104. Accordingly, subsection 11 is more than 'reasonably related' to the rest of the proposition; it depends on the rest of the proposition for its meaning and effect, and it would mean little or nothing if enacted in isolation." *Id.* at 13–14.

■ We acknowledge, as the Task Force contends, that where alternate constructions are available, we should choose that which avoids constitutional difficulty. *Greyhound Parks, Inc. v. Waitman*, 105 Ariz. 374, 377, 464 P.2d 966, 969 (1970); 2A J. SUTHERLAND, STATUTORY CONSTRUCTION § 45.11, at 46 (Sands 4th ed. 1984). Taking the more narrow construction of subsection 11 advanced by its proponents, we believe the single subject rule is not violated.

Adopting the narrow construction, subsection 11 deals only with procedural rules pertaining to victims and not with the substantive general subject of the rulemaking power. All provisions of the proposition then deal with victims' proposals. It may fairly be said also that the proposition comes much closer to a "consistent and workable whole on the general topic" of victims' rights and protections. *Kerby*, 44 Ariz. at 221, 36 P.2d at 554. Though there is still some question, we believe that voters supporting the procedural rights enumerated in subsections 1 through 10 might reasonably be expected to support the concept of legislative oversight over effectuation of those specific provisions. It is quite likely they might not do so if the entire rulemaking regime were to be changed. *Id.* We hold, therefore, that Proposition 104, interpreted in accordance with the narrow construction advanced by its proponents, does not violate article 21, § 1 of the Arizona Constitution.

MOELLER and CORCORAN, JJ., and SARAH D. GRANT, Chief Judge of the Court of Appeals, concur.

GORDON, C.J., recused himself and did not participate in this decision; pursuant to article 6, § 3 of the Arizona Constitution, SARAH D. GRANT, Chief Judge of the Court of Appeals, Division One, was designated to sit in his stead.

CAMERON, Justice, dissenting.

I dissent with the majority for two reasons. First, I believe this is a "two-headed

calf," and contrary to the single subject rule. The first 10 sections provide for certain rights for victims of crime. The 10 sections appear to be consistent with each other. Section 11, however, is quite different in that it takes away the rule-making power in criminal matters from the supreme court and gives it to the legislature. This is a significant difference.

Second, I believe that this provision is contrary to the inherent right of the courts to provide rules of procedure for the conduct of the state court system. The legislature has no more power to provide rules of procedure for the courts than the courts have power to order the legislature to adopt Roberts Rules of Order.

We note in the *Hastings Constitutional Law Quarterly* Volume 4, Spring 1977, No. 2 at page 286, that the courts of England made their own rules of procedure from the earliest times of which we have a record. George Grayson Tyler notes that a rule dated 1457 conferred on the prothonotaries (or clerks) in the Court of Common Pleas the function of drawing up "general rules, for regulating and settling the practice of the court, and the proceedings therein; and to certify the court in matters of practice, when required." [4] By the time the American Constitution was drafted, the King's Bench at Westminster had been exercising the power to make general rules of procedure for the courts under its jurisdiction. *Tidd's Practice* was the standard book for colonial America as well as English procedure. As Dean Roscoe Pound has pointed out:

> Hence, if anything was received from England as a part of our institutions, it was that the making of these general rules of practice was a judicial function. Indeed, this was well understood in the

beginning of American law. At the very outset, the Supreme Court of the United States, in answer to an inquiry by the Attorney General, said that the practice of the court of King's Bench would obtain for the time being, but that presently the court would promulgate some rules of practice. Not only was this done by the Supreme Court of the United States, but the old Supreme Court of New York, before 1847, promulgated rules of practice, very many of which were simply turned into sections of the Code of Procedure and are in force under that guise today.[5]

Dean Pound believed that in England the regulation of procedure went through four stages, legislative interference appearing only in the third stage, after the judicial tribunals in the second stage had formalized in rules of court what was originally the customary procedure of the tribunal. In the third stage, "Parliament makes sweeping changes both in fundamentals and in detail. For a season legislation is called on to bear the brunt of procedural reform." It should be noted, however, that even when the Parliament did intrude upon the court's rule-making function, it tacitly recognized the inherent power of the courts to make rules. The code of procedure adopted by Parliament in 1852 contained a provision permitting the judges to alter or amend any of the rules enacted by Parliament. The Judicature Act of 1873 "returned" the jurisdiction of the court rules back to the courts.

In the United States, legislative encroachment upon the rule-making power of the courts was led by David Dudley Field and his Codes of Procedure. Written in an era of legislative supremacy, these codes of procedure for courts were an abject fail-

---

**4.** Tyler, *The Origin of the Rule–Making Power and Its Exercise by Legislatures,* 22 A.B.A.J. 772, 774 (1936) (citation omitted) (hereinafter Tyler). According to Tyler, this rule alone indicates the antiquity of court rules, even though Tidd's tables for the Court of King's Bench include no rules prior to 1604. "[I]t is hardly to be supposed that none existed prior to that time. It is

probable Tidd merely had no occasion to cite them. We have the opinion of Jenks that court-made rules of practice go back uninterruptedly through the years until they are lost in the still unexamined archives of the fourteenth century." *Id.*

**5.** R. Pound, *The Rule–Making Power of the Courts,* 12 A.B.A.J. 599, 601 (1926).

ure.[6]

By the turn of the century, many writers were convinced not only that the enactment by the legislative branch of rules of procedure for the courts was an encroachment on the power of the court, in which by misfortune some courts had acquiesced, but also that the results of these rules had been dismal.[7] State courts later followed in defending their prerogatives and today recognize that the rule-making power is historically deposited with them as part of their inherent power.[8] As Professor Wigmore stated:

> [T]he legislature (federal or state) exceeds its constitutional power when it attempts to impose upon the judiciary any rules for the dispatch of the judiciary's duties; and that therefore all legislatively declared rules for procedure, civil or criminal, in the courts are void, except such as are expressly stated in the Constitution.

Wigmore, *All Legislative Rules for Judiciary Procedure are Void Constitutionally*, 23 Nw.U.L.Rev. 276, 276 (1928).

The judiciary should not share its rule-making power with the legislature or with anyone else. The making of the rules of court is a court function to be guarded jealously. I do not mean to infer that the people may never take away the rule-making power of courts. To do so, however, the constitutional amendment must be fairly, clearly and distinctly presented and not under the blanket of "victim's rights."

**6.** Note, *The Judiciary and the Rule–Making Power*, 23 S.Cal.L.Rev. 377, 381 (1971); *Fair v. State,* 220 Ga. 750, 141 S.E.2d 431 (1965).

**7.** Dowling, *The Inherent Power of the Judiciary,* 21 A.B.A.J. 635, 636 (1935); Franck, *Practice and Procedure in Mississippi: An Ancient Recipe for Modern Reform,* 43 Miss.L.J. 287 (1972); R. Pound, *supra* note 2, at 601; Sunderland, *The Exercise of the Rule–Making Power,* 12 A.B.A.J. 548, 549 (1926); Tyler, *supra* note 1, at 774. Dean Pound blamed court relinquishment of the inherent power to make their own rules on the "rule-of-thumb apprentice training of the bulk of the profession, which led them to feel that the whole of the law was bound up in procedure and hence that the legislature must prescribe judicial procedure or abdicate control over the law." R. Pound, *supra* note 2 at 601. But historically this rule-making power has be-

## APPENDIX

### PROPOSITION 104

PROPOSING AN AMENDMENT TO THE CONSTITUTION OF ARIZONA RELATING TO VICTIMS' RIGHTS; ...

Be it enacted by the People of the State of Arizona:

The following amendment to the Constitution of Arizona, adding Article II, § 2.1, is proposed, to become valid when approved by a majority of the qualified electors voting thereon and on proclamation of the governor:

Section 1. The Constitution of Arizona is amended by adding Article II, § 2.1:

### ARTICLE II, § 2.1

§ 2.1. *Victims' Bill of Rights*

SECTION 2.1. (A) TO PRESERVE AND PROTECT VICTIMS' RIGHTS TO JUSTICE AND DUE PROCESS, A VICTIM OF CRIME HAS A RIGHT:

1. TO BE TREATED WITH FAIRNESS, RESPECT, AND DIGNITY, AND TO BE FREE FROM INTIMIDATION, HARASSMENT, OR ABUSE, THROUGHOUT THE CRIMINAL JUSTICE PROCESS.

2. TO BE INFORMED, UPON REQUEST, WHEN THE ACCUSED OR CONVICTED PERSON IS RELEASED FROM CUSTODY OR HAS ESCAPED.

longed to the courts: "For the common-law courts have governed procedure by general rules from the middle ages to the present, and the first public action of the Supreme Court of the United States was to make a rule adopting the practice of the Court of King's Bench as the practice of that tribunal." *Id.*

**8.** *Garabedian v. Donald William, Inc.,* 106 N.H. 156, 157, 207 A.2d 425, 426 (1965); *Craft v. Commonwealth,* 343 S.W.2d 150, 151 (Ky.1961). The court in *Craft* points out that "it has generally been recognized that courts (even without express authority given by the constitution, statute, or rule of a supreme court of a state) have *inherent power* to prescribe rules to regulate their proceedings and to facilitate the administration of justice." *Id.* (citation omitted) (emphasis added).

3. TO BE PRESENT AT AND, UPON REQUEST, TO BE INFORMED OF ALL CRIMINAL PROCEEDINGS WHERE THE DEFENDANT HAS THE RIGHT TO BE PRESENT.

4. TO BE HEARD AT ANY PROCEEDING INVOLVING A POST–ARREST RELEASE DECISION, A NEGOTIATED PLEA, AND SENTENCING.

5. TO REFUSE AN INTERVIEW, DEPOSITION, OR OTHER DISCOVERY REQUEST BY THE DEFENDANT, THE DEFENDANT'S ATTORNEY, OR OTHER PERSON ACTING ON BEHALF OF THE DEFENDANT.

6. TO CONFER WITH THE PROSECUTION, AFTER THE CRIME AGAINST THE VICTIM HAS BEEN CHARGED, BEFORE TRIAL OR BEFORE ANY DISPOSITION OF THE CASE AND TO BE INFORMED OF THE DISPOSITION.

7. TO READ PRE–SENTENCE REPORTS RELATING TO THE CRIME AGAINST THE VICTIM WHEN THEY ARE AVAILABLE TO THE DEFENDANT.

8. TO RECEIVE PROMPT RESTITUTION FROM THE PERSON OR PERSONS CONVICTED OF THE CRIMINAL CONDUCT THAT CAUSED THE VICTIM'S LOSS OR INJURY.

9. TO BE HEARD AT ANY PROCEEDING WHEN ANY POST–CONVICTION RELEASE FROM CONFINEMENT IS BEING CONSIDERED.

10. TO A SPEEDY TRIAL OR DISPOSITION AND PROMPT AND FINAL CONCLUSION OF THE CASE AFTER THE CONVICTION AND SENTENCE.

11. TO HAVE ALL RULES GOVERNING CRIMINAL PROCEDURE AND THE ADMISSIBILITY OF EVIDENCE IN ALL CRIMINAL PROCEEDINGS PROTECT VICTIMS' RIGHTS AND TO HAVE THESE RULES BE SUBJECT TO AMENDMENT OR REPEAL BY THE LEGISLATURE TO ENSURE THE PROTECTION OF THESE RIGHTS.

12. TO BE INFORMED OF VICTIMS' CONSTITUTIONAL RIGHTS.

(B) A VICTIM'S EXERCISE OF ANY RIGHT GRANTED BY THIS SECTION SHALL NOT BE GROUNDS FOR DISMISSING ANY CRIMINAL PROCEEDING OR SETTING ASIDE ANY CONVICTION OR SENTENCE.

(C) "VICTIM" MEANS A PERSON AGAINST WHOM THE CRIMINAL OFFENSE HAS BEEN COMMITTED OR, IF THE PERSON IS KILLED OR INCAPACITATED, THE PERSON'S SPOUSE, PARENT, CHILD OR OTHER LAWFUL REPRESENTATIVE, EXCEPT IF THE PERSON IS IN CUSTODY FOR AN OFFENSE OR IS THE ACCUSED.

(D) THE LEGISLATURE, OR THE PEOPLE BY INITIATIVE OR REFERENDUM, HAVE THE AUTHORITY TO ENACT SUBSTANTIVE AND PROCEDURAL LAWS TO DEFINE, IMPLEMENT, PRESERVE AND PROTECT THE RIGHTS GUARANTEED TO VICTIMS BY THIS SECTION, INCLUDING THE AUTHORITY TO EXTEND ANY OF THESE RIGHTS TO JUVENILE PROCEEDINGS.

(E) THE ENUMERATION IN THE CONSTITUTION OF CERTAIN RIGHTS FOR VICTIMS SHALL NOT BE CONSTRUED TO DENY OR DISPARAGE OTHERS GRANTED BY THE LEGISLATURE OR RETAINED BY VICTIMS.