16 P.3d 200

Virginia KORTE;  Carla,
Plaintiffs/Appellees.

v.

Betsey BAYLESS, Secretary of State for
the State of Arizona, Defendant,

Preserve Arizona—Yes on Proposition 100
Committee, Ruth Hamilton, Chairwom-
an, Defendant/Appellant.

No.  CV–00–0308–AP/EL.

Supreme Court of Arizona,
En Banc.

Jan. 10, 2001.

**174**

Coppersmith, Gordon, Schermer, Owens & Nelson, P.L.C. by Andrew S. Gordon, Phoenix, Attorneys for Korte and Carla.

Janet Napolitano, The Attorney General by Thomas I. McClory, Assistant Attorney General and Mark Wilson, Assistant Attorney General, Phoenix, Attorneys for Betsy Bayless, Secretary of State.

Snell & Wilmer, L.L.P. by Timothy J. Casey, Gammage & Burnham, P .L.C by Grady Gammage and Cameron C. Artigue, Phoenix, Attorneys for Preserve Arizona—Yes on Proposition 100 Committee, Ruth Hamilton, Chairwoman.

Janet Napolitano, The Attorney General by Scott Bales, Solicitor General, Phoenix, Amicus Curiae.

Gallagher & Kennedy, P.A. by John E. Lundin, by Jeffrey D. Gross and John D. DiTullio, Phoenix, Attorneys for Amicus Curiae Jeff Groscost, Brenda Burns, Jack Brown, and Robert McLendon.

Jack Psfister, Tempe, Pro per Amicus Curiae.

## OPINION.

McGREGOR, Justice.

¶ 1 The question before us is whether Proposition 100, a ballot measure referred by the legislature to the people, encompasses more than a single subject and therefore violates Article XXI of the Arizona Constitution. Proposition 100 would alter existing constitutional mandates that govern the use and management of state trust lands. Although both proponents and opponents of placing Proposition 100 on the ballot make cogent and persuasive arguments, we narrowly conclude that Proposition 100 meets the test this court established in *Kerby v. Luhrs,* 44 Ariz. 208, 36 P.2d 549 (1934). On August 31, 2000, we entered an order reversing the judgment of the trial court, thereby permitting Proposition 100 to appear on the ballot, with this opinion to follow.[1]

### I.

¶ 2 As an initial matter, we address the procedural issues raised by the appellants, who argue that this action should be dismissed on grounds of laches and lack of subject-matter jurisdiction. We do not find these arguments persuasive.

¶ 3 We review the trial court's finding on laches for abuse of discretion. *Harris v. Purcell,* 193 Ariz. 409, 413, 973 P.2d 1166, 1170 (1998). In cases involving laches with regard to ballot measures, we have emphasized that, to avoid the problem of mootness, actions must be brought in sufficient time to allow the court to make a decision before absentee ballots must be printed. *See Mathieu v. Mahoney,* 174 Ariz. 456, 459, 851 P.2d 81, 84 (1993); *Kromko v. Superior Court,* 168 Ariz. 51, 57, 811 P.2d 12, 18 (1991).[2] In the instant case, the challeng-

---

1. At the November 2000 general election, the voters rejected Proposition 100. ARIZONA SECRETARY OF STATE, STATE OF ARIZONA OFFICIAL CANVASS at 15 (Nov. 27, 2000).

2. As should be evident, parties challenging a ballot measure should bring their action as soon as possible, rather than wait until the last day that permits them to argue that considerations of mootness do not bar their action. Whenever

ers filed their complaint almost eight weeks prior to the deadline for mailing the publicity pamphlet for early voting. That time period allowed sufficient time to render a decision before absentee balloting began, and we therefore do not find the action barred by laches.

¶ 4 The appellant committee also argues that this case does not present a justiciable controversy due to the absence of the real party in interest, the legislature. The practice in this state, however, has been to bring initiative challenges against the Secretary of State, the party to be enjoined, rather than the initiative's proponents. *Bolin v. Superior Court,* 104 Ariz. 76, 78, 449 P.2d 4, 6 (1969). An initiative's proponents must be joined only in cases in which the nature of the challenge presents a conflict for the Secretary of State. *See id.* The committee does not suggest that such a conflict exists here. Moreover, the challengers named as defendants not only the Secretary of State, but also the committee organized to support the initiative, a party sufficiently adverse to ensure full briefing of the issues and maintenance of the real controversy required for justiciability.

## II.

¶ 5 To determine whether Proposition 100, which proposes extensive amendments to Article X of the Arizona Constitution, complies with Article XXI, we must first understand the purpose of Article X as presently constituted. Article X governs the state's management of the public lands given to Arizona by the federal government at statehood for the support of educational and governmental institutions. Arizona received 10,-790,000 acres: 9,180,000 acres for educational purposes and the remainder for the support of various public institutions, such as penitentiaries and miners' hospitals. *Lassen v. Arizona,* 385 U.S. 458, 460 n. 2, 87 S.Ct. 584, 585 n. 2, 17 L.Ed.2d 515 (1967); *see generally* Douglas Dunipace, Comment, *Arizona's Enabling Act and the Transfer of State Lands for Public Purposes,* 8 Ariz.L.Rev. 133 (1966). Article X imposes extensive restrictions on the state's management of these lands. The state must act as a trustee of the lands, disposing of them only in the manner specified by the constitution and only for those purposes for which they were given. Ariz. Const. art. X, §§ 1–2. The state must conduct sales and leases of trust land in accordance with advertising and competitive bidding procedures, and must sell or lease for no less than appraised true value. *Id.* §§ 3–4, 8. The proceeds from the sale or lease of trust lands must be deposited into funds separated according to the purpose for which the trust land was granted, and money in each fund must be used for the specified purpose only. *Id.* § 7.

¶ 6 These constitutional provisions, which seek to ensure that Arizona uses its trust land only for the purposes for which it was granted, repeat almost verbatim the federal legislation authorizing the Territory of Arizona to organize a state government. *See* Arizona New Mexico Enabling Act, Pub.L. No. 219 (ch. 310), § 28, 36 Stat. 557 (1910) (reprinted in 1 A.R.S.). The full provisions of this Enabling Act also form part of the organic law of Arizona. *See* Ariz. Const. art. XX, § 12. Because the Enabling Act's restrictions are a matter of federal law, they cannot be altered without both amendment of the Arizona Constitution and congressional approval.[3] *See Kadish v. Arizona State Land Dep't,* 155 Ariz. 484, 486, 747 P.2d 1183, 1185 (1987).

¶ 7 Although the federal government routinely granted newly admitted states land for specific public purposes, the Enabling Act's stringent requirements for the management of trust land in Arizona and New Mexico are unique. Of the twenty-five states admitted to the union pursuant to enabling legislation, Congress subjected only those two states to such restrictions. *See Murphy v. State,* 65 Ariz. 338, 350–51, 181 P.2d 336, 344 (1947). When the U.S. House of Representatives

---

possible, parties should file actions raising constitutional issues at a time that permits the courts to give those issues the careful consideration that they deserve.

**3.** The proponents of Proposition 100 recognized that, even if the proposition had passed, it could become effective only if Congress changed the terms of the Enabling Act.

approved the Arizona–New Mexico Enabling Act, the Act did not restrict the management of state trust land. The Senate added the restrictions, acting out of concern over other states' misuse and waste of public lands that had been given to them for similar purposes. S.Rep.No. 454, at 18–20 (1910) (Report of the Committee on Territories, 61st Congress, 2d Session); *Murphy*, 65 Ariz. at 351–52, 181 P.2d at 344–45; *see also Lassen*, 385 U.S. at 468, 87 S.Ct. at 589. Indeed, mismanagement of trust lands raised so great a concern at the time of statehood that delegates to the Arizona Constitutional Convention considered adopting even more stringent safeguards, including a constitutional provision that would forbid entirely the sale of state trust lands. *See* The Records of the Arizona Constitutional Convention of 1910, at 704–10 (John S. Goff ed., n.d.). The delegates ultimately struck the balance between flexibility of management and procedural safeguards reflected in Article X.

¶ 8   Proposition 100 would re-formulate this balance. The proposition would amend Article X to allow the State Land Department to designate for conservation land with unique cultural or natural value; to provide state trust land for school siting; to permit exchanges of trust land for private land desirable for conservation or school siting; to authorize longer-term agricultural and grazing leases; to use up to five percent of the income generated by the State Land Department to better manage trust land; and to reduce or eliminate the advertising required before trust land can be sold or leased for longer than ten years. S.Con.Res. 1001, 44th Leg., 4th Spec. Sess. (2000). The purpose and single subject of these changes, according to documents filed in these proceedings by the proponents of Proposition 100, is to allow the State Land Department to manage state trust land in ways that deal with modern issues of growth and development. The appellees contend that the proposition evidences several purposes and therefore does not comply with our constitution's requirement that ballot measures encompass only a single subject.

### III.

¶ 9   Article XXI, Section 1 of the Arizona Constitution provides that "[i]f more than one proposed amendment shall be submitted at any election, such proposed amendments shall be submitted in such manner that the electors may vote for or against such proposed amendments separately." We have examined the test for determining whether an initiative conforms to this single-subject requirement on only a few occasions. In *Kerby v. Luhrs*, we reviewed the approaches taken by other states in interpreting similar constitutional requirements, and drew on those approaches to formulate a test for compliance:

> If the different changes contained in the proposed amendment all cover matters necessary to be dealt with in some manner, in order that the Constitution, as amended, shall constitute a consistent and workable whole on the general topic embraced in that part which is amended, and if, logically speaking, they should stand or fall as a whole, then there is but one amendment submitted. But, if any one of the propositions, although not directly contradicting the others, does not refer to such matters, or if it is not such that the voter supporting it would reasonably be expected to support the principle of the others, then there are in reality two or more amendments to be submitted, and the proposed amendment falls within the constitutional prohibition.

44 Ariz. at 221, 36 P.2d at 554.

¶ 10   Since our decision in *Kerby*, we have rejected arguments that would impose either a very narrow or a very broad interpretation of the test announced. We have refused to narrow the test to a strict rule that all components of a provision be logically dependent on one another, and likewise have refused to broaden the test to approve any initiative that demonstrates a topical relationship among its various provisions. The specific factors that determine whether a proposition complies with the single-subject rule vary as the subject matter of the propositions varies. However, we consistently have examined initiatives challenged under the single-subject rule to determine whether their provisions

are sufficiently related to a common purpose or principle [4] that the proposal can be said to "constitute a consistent and workable whole on the general topic embraced," that, "logically speaking, ... should stand or fall as a whole." *Kerby*, 44 Ariz. at 221, 36 P.2d at 554; *see also Slayton v. Shumway*, 166 Ariz. 87, 88–89, 800 P.2d 590, 591–92 (1990) (holding that an initiative providing ten enumerated rights of access, information, and participation to crime victims as well as authorizing the legislature to alter related procedural and evidentiary rules accordingly complied with the single subject requirement); *State ex rel. Jones v. Lockhart*, 76 Ariz. 390, 395–96, 265 P.2d 447, 451 (1953) (upholding an initiative that would both increase the number of senators representing each county and change the representation and apportionment in the house of representatives).

■ ¶ 11 In *Kerby* and our subsequent decisions, we described another formulation of the single-subject test by stating that if "the voter supporting [one proposition] would [not] reasonably be expected to support *the principle of the others*, then there are in reality two or more amendments to be submitted." *Kerby*, 44 Ariz. at 221, 36 P.2d at 554 (emphasis added). The appellees would have us interpret that statement as describing a test distinct from the common-purpose test and apply it to find an initiative violative of the single-subject rule if we cannot predict that most reasonable voters would be likely to support each individual provision of the initiative. We reject appellees' interpretation of this formulation of the *Kerby* rule as too narrow for two reasons. First, the "reasonable voter" measure does not define an entirely separate test, but rather provides an alternate approach for determining whether a proposal falls within the common purpose or principle test. Second, we have never applied the "reasonable voter" portion of the *Kerby* test to invalidate an initiative based upon our subjective prediction of voter behavior. Rather, we have considered objective factors that assist us in determining

whether the various provisions of a proposal further a common purpose or principle. For instance, we have considered whether various provisions are facially related, *see id.* at 222, 36 P.2d at 554; whether all the matters addressed by an initiative concern a single section of the constitution, *see Lockhart*, 76 Ariz. at 397, 265 P.2d at 451–52; whether the voters or the legislature historically has treated the matters addressed as one subject, *see id.*; and whether the various provisions are qualitatively similar in their effect on either procedural or substantive law, *see Slayton*, 166 Ariz. at 91, 800 P.2d at 594. These or similar objective factors indicate that voters would favor the proposition as a whole because the various provisions *further the same principle*.

¶ 12 The common-purpose test strikes a necessary balance between the concern over log-rolling embodied in Article XXI and the realities of modern legislation. As we emphasized in *Kerby*, the purpose of the single-subject rule is to eliminate the "pernicious practice of 'log-rolling,' " whereby voters are "forced, in order to secure the enactment of the proposition which [they] consider[ ] the most important, to vote for others of which [they] disapprove[ ] ." *Kerby*, 44 Ariz. at 214–15, 36 P.2d at 551–52. Log-rolling allows constitutional amendments that garner only minority support to become the law of the land by association, rather than through the endorsement of a majority required by our system of democratic governance. That result is impermissible.

■ ¶ 13 At the same time, an unduly narrow reading of the single-subject rule would render complex solutions to modern legislative problems difficult, sometimes even impossible. If the legislature or the people were to decide that a particular area of governmental concern, such as the rights of crime victims, required a unified, multifaceted approach, a narrow single-subject rule would require that the multiple facets be presented to the electorate as multiple, separate ballot measures.[5] Such an approach

---

4. See *Tilson v. Mofford*, 153 Ariz. 468, 472, 737 P.2d 1367, 1371 (1987) (noting that each provision in a proposition furthered the same purpose).

5. The Arizona Constitution provides another procedure for amending the constitution in Article XXI, Section 2, which permits the legislature to convene a convention if the voters, by a referen-

would entail a significant risk that some measures would pass while others would fail, potentially resulting in conflicting constitutional provisions or rendering those portions of the plan that passed ineffective alone. That approach could well render unachievable the instruction in *Kerby* that the constitution, as amended, "shall constitute a consistent and workable whole on the general topic embraced in that part which is amended." *Id.* at 221, 36 P.2d at 554. The common-purpose formulation permits the solution of complex problems while guarding against the passage of a combination of proposals, unrelated to a common principle or purpose, that proponents combine only to garner support from otherwise distinct groups of voters.

## IV.

¶ 14  The appellees, arguing that voters who support one provision of Proposition 100 cannot be reasonably expected to support others and that some components of the proposition are not logically dependent on the others, contend that this proposition contains several distinct provisions, insufficiently related and combined only for the purpose of securing the support of a majority of voters. The Arizona Attorney General, in her capacity as *amicus curiae,* argues additionally that the provisions of Proposition 100 do not all concern or relate to the general topic of state trust lands.

■ ¶ 15  If the general topic of Proposition 100 were as amorphous as "state trust lands," we would agree that its various provisions do not adequately relate to a common purpose or principle.  Taken to a sufficient degree of generality, nearly any group of provisions could claim some relationship. But the provisions of Proposition 100, at least as interpreted by its proponents, demonstrate more than a topical relationship.  All the proposed changes arguably further the purpose of permitting the State Land Department to manage state trust land in ways that address issues of wise growth and development, including conservation and sound stewardship of a limited resource, that were

dum vote, first approve laws providing for such a convention.  Arizona has never used this alterna-

not of concern at the time of statehood. Viewed with that general purpose in mind, Proposition 100 is analogous to the tort reform and victims' rights proposals we upheld in *Tilson* and *Slayton,* both of which involved a multifaceted approach to a single, reasonably narrow purpose.  The proposed Amendment X would constitute a "consistent and workable whole" on the general topic of managing trust land in ways that encompass issues of growth and development.  Moreover, all the proposals relate to the principle of the others, and all concern a single section of the constitution.

■  ¶ 16  Without doubt, as the appellees point out, one can envision more than one set of proposals that would further the purpose of managing growth and development wisely. As we concluded in *Tilson* and *Slayton,* however, a proposal can comply with the single-subject rule even though alternative proposals exist.  In those decisions, the opponents reasonably argued that the particular set of victims' rights or the particular set of methods chosen to regulate tort awards did not represent the only approach that could be taken to address the problem perceived by proponents of those propositions.  But those arguments speak more to the wisdom of approving the underlying purpose of the propositions involved, a decision left to the voters, than to whether a proposition complies with the single-subject rule.

¶ 17  We acknowledge that a fine line separates permissible ballot measures intended to implement multifaceted solutions to complex matters of governmental policy from those that impermissibly combine insufficiently related proposals.  On balance, we believe that Proposition 100 meets the test set out in *Kerby* and therefore falls on the permissible side of that line.

## V.

¶ 18  For the foregoing reasons, we reverse the decision of the trial court.

tive procedure.

CONCURRING: CHARLES E. JONES, Vice–Chief Justice, STANLEY G. FELDMAN, Justice, and FREDERICK J. MARTONE, Justice.

ZLAKET, Chief Justice, dissenting.

¶ 19 The primary purpose of Article XXI's single subject rule is to prevent "log-rolling," the practice of combining "dissimilar propositions into one proposed amendment so that voters must vote for or against the whole package even though they would have voted differently had the propositions been submitted separately." *Tilson v. Mofford,* 153 Ariz. 468, 471, 737 P.2d 1367, 1370 (1987). This political tactic seeks "to obtain a majority in favor of [a] joint proposal when neither standing alone could achieve such a majority." *Slayton v. Shumway,* 166 Ariz. 87, 90, 800 P.2d 590, 593 (1990) (citations omitted). Article XXI is designed to ensure that decisions made at the polls "represent the free and mature judgment of the electors, so submitted that they cannot be constrained to adopt measures of which in reality they disapprove, in order to secure the enactment of others they earnestly desire." *Kerby v. Luhrs,* 44 Ariz. 208, 221, 36 P.2d 549, 554 (1934). I cannot reconcile today's opinion with either Article XXI or our previous cases, and view the present measure as a clear example of log-rolling.

¶ 20 According to its text, the proposal in question "presents to the voters *several components* of the expanded growing smarter act." (Emphasis added). More specifically, it:

1. Enables the state land department to transfer certain trust lands to school districts at no cost to the districts.

2. Authorizes the designation of Arizona conservation reserve lands to protect from development state trust lands. . . .

3. Permits land exchanges and conveyances for conservation purposes.

4. Establishes that land designated for conservation or donated for schools may enhance the value of adjacent state trust land.

5. Permits up to five per cent of the income generated by the state land department to be appropriated to better manage the state trust land.

6. Authorizes agricultural and grazing trust land leases for longer than ten years without advertising or public auction. . . .

I respectfully submit that transferring trust lands to school districts at no cost and authorizing long term grazing leases without public notice are not part and parcel of a single subject within the meaning of our constitution.

¶ 21 Indeed, the overly broad scope of this measure has left even its proponents scrambling to describe a "general topic" that will "constitute a consistent and workable whole," as required by *Kerby.* 44 Ariz. at 221, 36 P.2d at 554. Appellant Preserve Arizona argued to the trial court that "all of [the initiative's] provisions unquestionably relate to the general topic of land conservation." Amicus Pfister expressly disagrees, submitting instead that the single purpose of the proposition is the "management of state trust land for quality growth." Amici Groscost, Burns, McClendon, and Brown attempt to reconcile these positions by claiming that the initiative provides "inter-related tools under the penumbra of land management to promote conservation, accommodate growth and enhance the value of surrounding trust lands." Whenever this court is asked to consider a measure's "penumbra," it should be alert that the single subject rule may be at risk.

¶ 22 The majority concedes that "[i]f the general topic of Proposition 100 were as amorphous as 'state trust lands,' we would agree that its various provisions are not adequately related to a common purpose or principle." *Supra* at ¶ 15. I am not sure, however, which of the following is less vague— "state trust lands," "land management," "quality growth," or "conservation." Virtually anything having a relationship to one or more of these broad descriptive categories could be patched together under the majority's "common purpose" analysis.

¶ 23 The danger, of course, is that similar multi-faceted proposals may be drafted to include all kinds of loosely connected items under the guise of being "inter-related tools." One supposes, for example, that the umbrella of "environmental protection" encompasses

such disparate threats as nuclear waste, automobile pollution, industrial chemicals, agricultural fertilizers, and pesticides. It seems clear, however, that a proposal addressing all of these together would violate *Kerby.*

¶ 24 I agree with the trial judge that this measure is constitutionally flawed. It is likely that a conservation-minded voter would favor saving unique trust lands, but disagree with permitting agricultural and grazing leases for longer than ten years without advertising or public auction. An education advocate may support the no-cost transfer of trust lands to school districts, but oppose the initiative's appropriation section.

¶ 25 I do not view this case as being any different from *Arizonans Against Unfair Tax Schemes v. Bayless,* 199 Ariz. 180, 16 P.3d 207 (2000). There, we affirmed the trial court's decision that an initiative violated the single-subject rule because it caged several subjects loosely related to income taxation together in one proposal.

¶ 26 Because I believe that the instant measure violates Article XXI of our constitution and fails the *Kerby* test, I respectfully dissent.