851 P.2d 81

Deborah MATHIEU and Arizona League of Women Voters, Inc., an Arizona nonprofit corporation, Plaintiffs/Appellees,

v.

Richard MAHONEY, Secretary of State of the State of Arizona, Defendant/Appellant,

ARIZONANS FOR COMMON SENSE, Real Party in Interest/Appellant.

No. CV–92–0364–AP.

Supreme Court of Arizona, En Banc.

Feb. 18, 1993.

Miller, Pitt & McAnally by Grace McIlvain, Tucson, and Law Offices of Stanley Lubin by Stanley Lubin, Phoenix, for plaintiffs/appellees.

Grant Woods, Atty. Gen. by Robert B. Carey, Asst. Atty. Gen., Phoenix, for defendant/appellant Mahoney.

Johnston Maynard Grant & Parker by Daniel D. Maynard, Douglas C. Erickson, Michael D. Curran, Phoenix, for appellant Arizonans for Common Sense.

OPINION

CORCORAN, Justice.

This case comes on direct appeal from an order granting plaintiffs' request for a permanent injunction enjoining the Secretary of State from printing as Proposition 110 the "Preborn Child Protection Amendment" on the November 3, 1992 general election ballot. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3), and A.R.S. § 19–122(C).

Because we conclude that plaintiffs' claim is barred by the doctrine of laches, we do not reach the merits of the controversy, nor do we reach the defendant's due process objections. *See Mandraes v. Hungerford,* 127 Ariz. 585, 587–588, 623 P.2d 15, 17–18 (1981). We entered an order on September 22, 1992, with Feldman, C.J., dissenting, that lifted the injunction previously entered by the trial court and reversed the trial court's judgment. That order indicated that an opinion would follow. This is that opinion.

*Factual and Procedural History*

The parties are plaintiff Deborah Mathieu and plaintiff Arizona League of Women Voters, Inc. (League). The defendants are Arizonans for Common Sense (Arizonans) and Secretary of State (Secretary). Proposition 110, known as the "abortion amendment," sought to prohibit abortions with some exceptions and to prohibit state expenditures for abortions. The proposed Proposition read in part:

Section 1. No public funds shall be used to pay for an abortion, except when that procedure is necessary to save the life of the mother.

Section 2. No preborn child shall be knowingly deprived of life at any stage of biological development by any person except to save the life of the mother. However, the Legislature shall provide for exceptions only in those circumstances where pregnancy results from an act of either reported sexual assault or reported incest.

■ The text of Proposition 110 became public on August 7, 1991 when Arizonans submitted the initiative text and an application to the Secretary to place Proposition 110 on the November 1992 state general election ballot.[1] Almost a year later, on July 2, 1992, Arizonans filed an initiative petition and supporting signature sheets with the Secretary. The Secretary issued a temporary receipt to Arizonans on July 7, 1992, pursuant to A.R.S. § 19–121.01, acknowledging that Arizonans had submitted 255,188 signatures in support of the initiative. Arizonans needed 166,227 valid signatures to qualify Proposition 110 for the 1992 general election ballot. *See* A.R.S. § 19–121.04(A) & (B). On August 12, 1992, the Secretary certified 181,889 signatures, insuring that Proposition 110 would be on the November ballot absent a successful challenge.

The Secretary issued a publicity pamphlet in advance of the general election to inform voters of the upcoming propositions, pursuant to A.R.S. § 19–123(A). Sufficient pamphlets were printed before the primary (which occurred on September 8, 1992) to distribute to 80% of the registered voters at primary election polling places. *See* A.R.S. § 19–123(B). The pamphlet contained arguments for and against each proposition that were submitted by interested individuals and organizations. On July 10, 1992, the League submitted an argument, which was included in the publicity pamphlet, urging voters to vote "no" on Proposition 110.

Over 2 months later, on September 15, 1992, plaintiffs filed a complaint and an application for permanent injunction. Plaintiffs argued that Proposition 110 violated the single subject provision, Ariz. Const. art. 21, § 1, by containing language in the same initiative that both restricted the use of public funds for abortion and prohibited abortions with some exceptions.[2]

Defendants responded on September 17, 1992. They contended that plaintiffs waited too long to challenge the proposition, and that even if the court reached the merits, it should deny the injunction and dismiss the complaint.

A trial on the merits was held in superior court on the day the response was filed, 2 days after the complaint was filed and only one day after service of the complaint. The League presented an expert whom it had obtained on September 13, 1992 to testify. Over defendants' objections as to timeliness, the expert testified based on a survey concerning the likelihood that different groups of voters would support or oppose different portions of the proposition. Defendants could not controvert this testimony because they had not had time to secure their own expert or to conduct a survey. They did, however, object to the presentation of any evidence. Defendants objected concerning the short time frame

---

1. We take judicial notice of the records of the Secretary of State. *Bolin v. Superior Court,* 85 Ariz. 131, 333 P.2d 295 (1958).

2. Ariz. Const. art. 21, § 1 reads, in part:

If more than one proposed amendment shall be submitted at any election, such proposed amendments shall be submitted in such manner that the electors may vote for or against such proposed amendments separately.

for the proceedings when plaintiffs offered the expert's survey report into evidence:

MR. MAYNARD: Your Honor, I do have some objections. I obviously just received [the survey report], and I'm just now looking at it. I don't object to what [the expert] did. I do object to any polling information from other sources. I haven't figured out exactly how they're going to be used or what they are. They seem to be back here, and I haven't gotten to it yet.

....

THE COURT: All right. Any objection to the Exhibit 1 ... with the deletion of the last two pages, is that what you will object to?

....

MR. MAYNARD: Well, it's pages, a portion of page three, all of page four and page five, your Honor.

And, to make it perfectly clear, I object to the whole proceeding going forward with evidence, your Honor....

....

THE COURT: All right. Mr. Maynard, other than the fact that the evidence is being presented, you believe, too late in the game, other than that what specifically are you objecting to?

Defendants also complained about the lack of time to prepare for cross-examination:

MR. CAREY: Your honor, because of the stage of the [absentee] ballot production process we're in because there really can be no relief as to printing, the State has no question for the witness.

But I would like to state for the record that I did not find out what the testimony of the witness was going to be until I heard it. I just received her affidavit today, and consequently I'm really not prepared to cross-examine the witness....

The trial court was concerned about the condensed time frame. In considering whether or not to recess for lunch, the court stated:

I'd like to complete this as quickly as possible. I believe I should make a deci-

sion so that if there's any appellate review it should be put in the hands of the Supreme Court today, if possible. I'm sure everyone wants that decision, ultimate decision determined today or tomorrow, prior to printing of the ballots.

The trial court, troubled by defendants' due process and laches objections, disregarded plaintiffs' expert but ruled in plaintiffs' favor as a matter of law. The minute entry states:

Defendants' assertion of the lack of due process and laches on the part of the plaintiffs, and particularly the prejudice they have suffered by reason of the presentation of evidence for which they had no opportunity to meet and counter strikes a cord with the court. The court permitted the plaintiffs to present their evidence.... However, the court has not considered this evidence in its decision.

The court, applying "logic and law," found that Proposition 110 violated the single subject provision, and on September 18, 1992, entered an order granting plaintiffs' request for an injunction. The trial court denied Arizonans' motion to stay the injunction pending appeal.

On the same day, Arizonans filed a notice of appeal. Oral argument was set before this court on September 22, 1992, and an order was entered on the same day reversing the trial court's judgment. Plaintiffs filed a motion for reconsideration on September 24 and concurrently filed a motion to expedite the response date because absentee ballots were to be printed imminently. The motion to expedite was granted. Defendants filed responses on September 25, 1992. On the same day, this court denied plaintiffs' motion for reconsideration.[3]

### Discussion

 The defense of laches is available in an action challenging the legal sufficiency of a proposed initiative measure and seeking to enjoin the measure's printing on

---

**3.** The voters ultimately defeated Proposition 110. Unofficial election results show 68.5% (941,844) voted "no" and 31.5% (432,813) voted "yes."

the official ballot. A.R.S. § 19–122(C); *Kromko v. Superior Court*, 168 Ariz. 51, 57, 811 P.2d 12, 18 (1991). As we stated in *Kromko*, "[a]n action to enjoin placing an initiative or referendum proposal on the ballot is equitable in nature, and therefore may be subject to equitable defenses such as laches." 168 Ariz. at 57, 811 P.2d at 18. Our concern with timeliness stems in part from the notion that "disputes concerning election and petition matters must be initiated and heard in time to prepare the ballots for absentee voting to avoid rendering an action moot." *Kromko*, 168 Ariz. at 57, 811 P.2d at 18. In *Kromko*, the court found the challenge to be timely when brought more than a month and a half before absentee voting began. 168 Ariz. at 57, 811 P.2d at 18.

We have articulated the most recent laches test as follows:

We emphasize that laches may not be imputed to a party for mere delay in the assertion of a claim. Rather, the delay must be unreasonable under the circumstances, including the party's knowledge of his or her right, and it must be shown that any change in the circumstances caused by the delay has resulted in prejudice to the other party sufficient to justify denial of relief.

*Flynn v. Rogers*, 172 Ariz. 62, 66, 834 P.2d 148, 152 (1992).

At least one other jurisdiction has applied the doctrine of laches to invalidate a challenge to an initiative petition. *State ex rel. Fidanque v. Paulus*, 297 Or. 711, 688 P.2d 1303 (1984). In *Fidanque*, the plaintiffs petitioned the Oregon Supreme Court for a writ of mandamus alleging breach of duty by the Secretary of State in certifying a proposed initiative petition in violation of the Oregon constitution's single subject provision. *Fidanque*, 688 P.2d at 1304. The court found the challenge to be untimely because it was brought over 10 months after the alleged breach would have occurred. 688 P.2d at 1307–08. The court stated:

Besides being prejudicial to the defendant and the petition circulators, such delay puts an unreasonable burden on

the court. The matter could have been litigated in the circuit court with ample time for narrowing and clarification of issues through the normal judicial process. Rather than follow such a procedure, Plaintiff–Relators have waited until the eleventh hour to bring their present challenge. To wait until the last moment places the court in a position of having to steamroll through the delicate legal issues in order to meet the deadline for measures to be placed on the ballot.

688 P.2d at 1308 (footnote omitted).

Such is the case here. Plaintiffs' delay in filing this suit occurred more than a year after the League knew of Arizonans' statewide efforts to circulate petitions and submit them for certification. Arizonans had been securing signatures on a statewide basis for over a year before the League actually filed suit. The League knew of Arizonans' campaign since August 1991 when the text was made public. The League took action against the proposed initiative on July 10, 1992, when it submitted its publicity pamphlet argument. At a minimum, the League could have filed its complaint when the Secretary certified the signatures on August 12, 1992, at which juncture the Proposition was certain to be placed on the ballot. Instead, it waited until September 15, 1992 to file its complaint, only days before the absentee ballots were to be printed for statewide absentee voting beginning October 1.

We find this delay both unreasonable and prejudicial because it strains the quality of decision making and is ultimately unfair to all involved. It prejudiced defendants in the preparation of their defense. Less than 24 hours passed from the time the complaint was served until the time the matter was litigated on the merits in the trial court. In 24 hours, defendants had to retain counsel; marshal their witnesses, facts and legal arguments; analyze the challenge; research and brief the issues; and prepare for a trial on the merits to defend against undisclosed evidentiary materials presented by plaintiffs. Defendants did not have the opportunity to develop and present their own evidence, hire an expert,

or prepare their cross-examination. Defendants should have had this opportunity even if plaintiffs did *not* present evidence, and even though, as happened, the trial judge did not consider the evidence that plaintiffs did submit. The record shows that Arizonans' attorney resourcefully struggled to piece together an adequate cross-examination of the expert, but not without obvious difficulty. Even though the trial court discounted plaintiffs' expert testimony, the abbreviated time frame jeopardized defendants' ability to present any effective defense. By contrast, the League had more than a month to prepare its case.

The same problem infected the appellate process. After the trial court's ruling, defendants were equally rushed. They needed to evaluate the trial court's order and serve plaintiffs with an appellate brief within a 24–hour time frame.

Plaintiffs seek to excuse this last-minute filing because they had difficulty finding replacement counsel when the original pro bono counsel withdrew. This court has held that "[m]ere financial inability to prosecute a suit is not an excuse for an unreasonable delay." *Price v. Sunfield*, 57 Ariz. 142, 149, 112 P.2d 210, 213 (1941).

We cannot agree with the dissent's conclusion that prejudice here was nonexistent. It may well be that lawyers are often required to respond on short notice, as the Chief Justice suggests. Few will honestly claim, however, that they did their best work or anything even close to it under such circumstances, especially when their opposition enjoyed the unmatched luxury of months to prepare.

Regardless of how one might feel about the wisdom of Proposition 110, the process was unfair. More importantly, however, this "rush to judgment" was quite unnecessary. No persuasive explanation has been offered for delaying the initiation of this action until a few days before the deadline for ballot printing. The delay is unreasonable on its face.

We wish to emphasize that the decision in this case is not about "hardship on the lawyers" or "judicial inconvenience," as the Chief Justice suggests. Rather, it is in part about simple fairness, nothing more nor less. It concerns fairness to those who invested countless hours and substantial funds for almost a year in order to get Proposition 110 on the ballot for a public vote; fairness to the quarter of a million citizens who signed the initiative petitions, as well as those who labored to collect the signatures; and fairness to a judicial process that earns public respect and support by producing careful, well-reasoned decisions after a complete exposition of the issues. Simple fairness is the real basis for applying the equitable doctrine of laches here and in most other circumstances.

The ultimate prejudice in election cases is to the quality of decision making in questions of great public importance. In ordinary private litigation, the laches defense requires a court to focus on the prejudice to the parties. But public litigation, such as election contests and challenges to ballot propositions, implicates interests well beyond the parties to the case. Litigants and lawyers involved in such litigation must be keenly aware of the need to bring such cases with all deliberate speed or else the quality of judicial decision making is seriously compromised.

The doctrine of laches prevents a party from asking this court to decide a difficult question of Arizona constitutional law on the eve of ballot printing when such a question could have been presented much earlier. Courts should not be forced to make hasty legal decisions in such important areas simply because the parties bringing such cases had difficulty, as here, in finding lawyers. Special interest groups and the lawyers who represent them are aware of the difficult time pressures involved in ballot litigation. They have an affirmative duty to bring their challenges as early as practicable. When a laches defense is raised in an election contest, a court must assess whether the plaintiffs have delayed unreasonably or failed to act diligently with that affirmative duty in mind.

In short, the time within which difficult and delicate constitutional decisions must be made should not be collapsed into so brief a period unless necessary. It was not necessary here.

Although we realize that last-minute challenges are inevitable, we do not wish to encourage them by allowing plaintiffs in this case to escape the application of the doctrine of laches. Last-minute election challenges, which could have been avoided, prejudice not only defendants but the entire system. They deprive judges of the ability to fairly and reasonably process and consider the issues. They unreasonably telescope the process and rush appellate review, leaving little time for reflection and wise decision making.

We have an obligation, especially regarding matters of public interest such as elections, to provide a forum for resolving disputes in a fair and accurate manner. Such a forum was not possible here solely because of plaintiffs' delay. Plaintiffs' claim is therefore barred by the doctrine of laches.

The judgment is reversed.

MOELLER, V.C.J., and ZLAKET and MARTONE, JJ., concur.

FELDMAN, Chief Justice, dissenting:

The majority today explains its previous order that the Arizona League of Women Voters was guilty of laches in its attempt to keep Proposition 110 off the ballot, so that its request for an injunction should have been denied by the trial court. I dissented from the previous order, and I dissent from the present opinion explaining that order.

As the majority acknowledges, the affirmative defense of laches exists only when the evidence shows that the delay is " 'unreasonable under the circumstances ... and ... the delay has resulted in prejudice to the other party sufficient to justify denial of relief.' " [4] Neither of these predicates for the doctrine of laches is supported by the record in this case.

### UNREASONABLE DELAY

The plain facts show that there was delay in bringing the injunction suit. But

was that delay unreasonable? In rejecting laches as a defense, the trial judge implicitly found that the delay was not unreasonable. Neither the Secretary of State nor Arizonans for Common Sense made any attempt to establish facts showing that the delay was unreasonable. It was their burden to establish the defense of laches. *See Lakin Cattle Co. v. Engelthaler*, 101 Ariz. 282, 284, 419 P.2d 66, 68 (1966); Rule 8(c), Ariz.R.Civ.P., 16 A.R.S. Despite this, the majority summarily concludes that the delay was unreasonable because plaintiffs could have brought the suit earlier.

The court should not presume that a citizens' organization dealing with issues so divisive and emotional as abortion rights and funding acted unreasonably simply by failing to bring the action earlier than five weeks after the signatures were certified. Although plaintiffs may have known of their potential legal challenge in advance, they hardly could have brought the action before certification. There was no way to tell whether the large number of necessary signatures would even be obtained—let alone certified.

We do know that pro bono counsel who was working on the case withdrew, making it necessary to find new pro bono counsel. We do not know why prior counsel withdrew, but we do know that the new counsel acted more than expeditiously. In sum, we know that there was delay, we know that the case was filed late—as has been almost every other election contest that this court has heard, but we do not know the *cause* of the delay. It follows, therefore, that we cannot know that the delay was unreasonable. Because it is the *defendant's* burden to show the delay was unreasonable, the trial judge did not abuse her discretion in rejecting the defense of laches.

### PREJUDICE

Even if the delay had been unreasonable, laches should not be applied because the defendants have failed to show prejudice.

---

**4.** Majority at 459, 851 P.2d at 84 (quoting *Flynn v. Rogers*, 172 Ariz. 62, 66, 834 P.2d 148, 152 (1992) (emphasis added)).

The trial judge explicitly refused to rely on plaintiffs' expert evidence, disregarding it altogether in reaching her decision. Instead, the ruling was based solely on the judge's reading of the proposed constitutional amendment and her conclusion that, as a matter of law, Proposition 110 facially violated the single subject requirement of article 21, § 1 of the Arizona Constitution.

The trial judge did not abuse her discretion in disregarding expert evidence when applying the single subject rule to the proposed constitutional amendment. After all, no Arizona court applying article 21, § 1 has ever indicated that it considered, needed, or wanted expert evidence to help decide whether a proposed amendment or statute dealt with more than one subject. Although such evidence might be useful, we have, to date, decided every case brought under this constitutional provision without the benefit of expert testimony. *See Slayton v. Shumway,* 166 Ariz. 87, 800 P.2d 590 (1990); *Tilson v. Mofford,* 153 Ariz. 468, 737 P.2d 1367 (1987); *State ex rel. Nelson v. Jordan,* 104 Ariz. 90, 449 P.2d 18 (1968), *vacated,* 104 Ariz. 193, 450 P.2d 383, *appeal dismissed,* 396 U.S. 5, 90 S.Ct. 24, 24 L.Ed.2d 4 (1969); *State ex rel. Jones v. Lockhart,* 76 Ariz. 390, 265 P.2d 447 (1953); *Kerby v. Luhrs,* 44 Ariz. 208, 36 P.2d 549 (1934). Nor did the defense in this case suggest that such testimony was necessary from its standpoint. The real prejudice that the majority relies on, therefore, is, first, the hardship defendants' lawyers may have experienced in preparing for the hearing, and, second, the perceived unfairness to the process when this court must hear and decide the matter so quickly.

## A. Hardship to Counsel

While I share much of the court's concern regarding the difficulties encountered and the dangers presented when the court and the lawyers must act so quickly, I believe the majority makes too much of the difficulty defendants' lawyers may have had in addressing the issues in this case on short notice. According to the majority,

defendants were prejudiced because on short notice their lawyers were forced to "marshal their witnesses, facts and legal arguments; analyze the challenge, research and brief the issues; and prepare for a trial on the merits to defend against undisclosed evidentiary materials." [5] I am not persuaded. There are many lawyers who have done as much in preparing to meet requests for stays, temporary restraining orders, and preliminary injunctions, as well as petitions for writs of mandamus, prohibition, and all other matters now encompassed under the rubric of special actions. *See* Rule 1, Ariz.R.P.Spec.Act, 17B A.R.S.

Such inconvenience, unfortunately, is the emotional and physical cost of time-dependent equitable relief. To date, so far as I know, all of our lawyers have survived such hardships. The experienced, able defense lawyers in this case have no doubt suffered this type of pressure many times before and will do so again. For trial lawyers, such hardships are a way of life, not legal prejudice. Inconvenience to counsel is not grounds for denying equitable relief in so important a case.

Thus, the court is overly concerned about defense counsel's difficulties in preparing cross-examination.[6] The court impressively describes the defense attorneys' "resource[ful] struggl[e] to piece together an adequate cross-examination of the expert." [7] As all trial lawyers know, resourceful struggle is not extraordinary in cross-examination. Every day, lawyers appearing on even shorter notice at hearings on stays, temporary restraining orders, and the like effectively cross-examine witnesses on issues far more demanding than whether the words of the proposed amendment covered one issue or two. Moreover, even if, as the majority concludes, defendants were prejudiced by their struggle during cross-examination, it was of no consequence because the trial judge ultimately disregarded plaintiffs' expert evidence. Defendants would not have been helped by having a full five weeks to prepare for cross-examination of an expert witness

5. Majority at 459, 851 P.2d at 84.

6. Majority at 460, 851 P.2d at 85.

7. Majority at 460, 851 P.2d at 85.

whose testimony the trial judge ultimately refused to consider.

The issues in this case were not complex. No expert evidence was required. Realistically, the most important preparation required in this case was reading the six Arizona cases on the subject—the five listed above and one from the court of appeals. They are all cited in the Arizona Revised Statutes annotation under article 21, § 1 of the Arizona Constitution. One supposes that is just how defense counsel found them. They were all decided as matters of law and may be read, digested, and understood in a few hours. I have every confidence that defense counsel were able to read the cases, marshal their legal arguments, and present them to the judge within the time frame available. I have seen less experienced counsel do as much in less time. Admittedly, working so hard with so little notice is a hardship on the lawyers. Without much more, it is not the same as legal prejudice.

**B. Judicial Inconvenience**

Finally, the court indicates that the inconvenience to this court in having to schedule, hear, and decide a matter such as this on short notice somehow constitutes prejudice.[8] I disagree. As to the "public litigation"[9] rationale adopted by the majority, concerned and interested private parties and citizens' groups on all sides of various questions frequently seek resolution of thorny legal matters on short notice. When these matters involve significant issues of public concern, such as compliance with the constitutionally mandated single subject rule, this court should not avoid the merits by raising a shield called laches. Rather, as trial courts do, we should make every effort to hear the merits of the case. I have every confidence that this court could have properly resolved the issues presented without compromising the integrity of the process or its result. Simply put, judicial inconvenience is not the same as laches. Absent a showing of prejudice attributable to short notice, this court should not refuse to hear the merits. The

majority's rationale falls under its own weight. If, due to the shortness of time, the court could not adequately assess the merits of the single legal issue raised by plaintiffs' challenge, how could it adequately assess the merits of a laches defense in the same time period? I agree that the "quality of judicial decision making" should not be "seriously compromised."[10] This argument, however, should apply equally to the equitable doctrine of laches as to the constitutionally mandated single subject provision. *See* Ariz. Const. art. 21, § 1.

In sum, I find no grounds in this case on which to conclude that the trial judge erred in rejecting the defense of laches. The trial judge made no finding that the delay was unreasonable, the defendants produced no evidence indicating that it was, and there is simply no showing of real, relevant prejudice. I believe, therefore, that this court could have and should have decided the substantive issue under article 21, § 1. In these days of public relations campaigning, the importance of adhering to the constitution's single subject requirement transcends the inconvenience to court and counsel of grappling with difficult issues on short notice. I therefore dissent.

---

**8.** Majority at 460–61, 851 P.2d at 85–86.

**9.** Majority at 460, 851 P.2d at 85.

**10.** Majority at 460, 851 P.2d at 85.