## TOWN OF PLYMOUTH *v.* MELANIE CHURCH-DLUGOKENSKI*

Superior Court, Judicial District of New Britain
File No. CV-02 0518482S

Memorandum filed September 18, 2003

*Updike, Kelly & Spellacy*, for the plaintiff.

*Cramer & Anderson*, for the defendant.

---

* An appeal to the Appellate Court by the defendant was filed on November 7, 2003; Appellate Court Docket No. AC 24810. On March 31, 2004, the appeal was withdrawn on settlement of the parties.

COHN, J. This is a declaratory judgment action brought by the plaintiff, the town of Plymouth (town), against the defendant, Melanie Church-Dlugokenski, to determine the validity of a referendum held on May 14, 2002. The defendant has filed a counterclaim seeking a declaratory judgment that the referendum be declared null and void. At a hearing held on June 17, 2003, the parties agreed to move jointly for judgment on the sole issue of whether the defendant had timely raised her challenge to the referendum.[1]

The facts of record, as provided by affidavits and other documentary evidence,[2] are as follows. On April 9, 2002, the town's governing body, the town council, authorized the issuance of $47 million in bonds to convert the town high school into a middle school, convert a middle school to an elementary school and construct a new high school at a yet unchosen site. Under the town charter, the town council's decision was subject to a referendum vote. Timely notice of the referendum was given to the electors of the town, setting the date of the referendum for May 14, 2002.

On May 14, 2002, the referendum was held following the procedure of past town referenda. There was only one town polling place. A sign at the entrance of the polling place directed persons who were property owners-taxpayers, but not registered voters, to a separate check-in table dedicated to such persons. These taxpayers were allowed to participate in the vote and 311 did so.

---

[1] The cross motions, as subsequently filed, were for summary judgment and considered whether the defendant was in violation of a statutory provision and also the equitable ground of laches. Neither party has objected to the court's considering each of these issues as briefed.

[2] There is no genuine issue of material fact on these cross motions for summary judgment. The court, therefore, may render judgment as a matter of law. Practice Book § 17-49; *Dept. of Social Services* v. *Saunders*, 247 Conn. 686, 695, 724 A.2d 1093 (1999).

The result of the referendum was that the bonding resolution of the town council was approved by eighty-two votes (3398 votes cast, 1740 favoring and 1658 opposing). The tally sheet and moderator's return indicated both the results of the referendum and that 311 taxpayers, nonelectors in the town, had participated in the vote. This tally sheet was filed with the town clerk on the night of the referendum.

The resolution authorizing the bond issue did not contain any specific location for the new high school. After the apparent successful approval of the bond issue at the referendum, the town began to take steps to select an appropriate site, including focusing on the environmental status of one site on Route 6 in town. The town also proceeded with the preliminaries to the issuance of the bonds and, in the words of David Mischke, mayor of the town, spent approximately $400,000[3] "in good faith reliance on the results of the Referendum."

The defendant and others in town disputed the result of the election. A petition was circulated on September 9, 2002, "by Defendant and others seeking to overturn the referendum by elector's petition for misrepresentation of environmental issues." The town clerk rejected action on this petition on September 16, 2002. The town clerk wrote to one of the proponents of the petition that the charter controlled referenda on bond authorization, and not provisions of the General Statutes. The charter did not allow for a repeal referendum.

Also on September 16, 2002, the defendant consulted with an attorney. In the course of her discussion with the attorney, she revealed that taxpayers had voted in the referendum. In a letter dated September 19, 2002,

---

[3] These expenditures related to the cost of an environmental investigation at a proposed site and to architectural work in general. There was presumably a preliminary amount expended in preparing to issue the bonds.

the defendant's attorney notified the town's bond counsel that, in his view, the votes cast by the taxpayers were illegal under the town charter and that the referendum was null and void. In a letter written four days later, the bond counsel advised the town that it should hold another referendum "if more than 82 votes at the high school referendum were cast by persons owning property who are not otherwise electors. . . ."

On November 11, 2002, after the town had retained new counsel, it brought an action alleging that the defendant had raised uncertainty so that the town could not proceed with the issuance of the bonds necessary for completion of the school projects. The town sought "[a] declaratory judgment determining that the results of the May 14, 2002 Referendum and approval of the Bond Resolution are final and not subject to contest at this time." On December 24, 2002, the defendant brought a counterclaim alleging that the referendum was flawed because illegal taxpayer voting had occurred. She asked for a declaratory judgment that only electors may vote at future bond referenda and that the May 14 referendum be declared null and void. The parties have now moved for summary judgment on the timeliness of the defendant's protest to the referendum.[4]

The first issue is whether the town is correct that the defendant missed a statutorily set, fourteen day deadline. The town begins by citing General Statutes § 9-369, which provides that the results of a referendum must be determined "as nearly as may be in accordance with the provisions governing the election of officers in the state or in such municipality." The town further

---

[4] The town is sufficiently aggrieved to have raised the issue of timeliness. See *Windham Taxpayers Assn.* v. *Board of Selectmen,* 234 Conn. 513, 662 A.2d 1281 (1995). For the purposes of this motion, the court does not have to consider whether the defendant is sufficiently aggrieved to bring her counterclaim.

argues that, in the context of its legislative history,[5] § 9-369 does not distinguish between referenda held on the day of election and "stand-alone" referenda.[6] The town also supports its position by citations to two cases where, while ruling on the text of ballots in a referendum, reference was made to the applicability of § 9-369. See *Clark* v. *Gibbs*, 184 Conn. 410, 417 n.11, 439 A.2d 1060 (1981); *Morris* v. *Newington*, 36 Conn. Sup. 74, 85–86, 411 A.2d 939 (1979), aff'd, 180 Conn. 89, 428 A.2d 342 (1980). The town's position is that § 9-369 requires that the fourteen day deadline of General Statutes § 9-328, the election contest statute, apply to the defendant's challenge to the validity of the referendum.

On the other hand, the defendant has correctly pointed out that the explicit language of § 9-369 limits the section to those referenda held in conjunction with "any regular or special state or municipal election." In addition, General Statutes § 9-369a, which establishes the procedure for the submission of local questions at an election, applies to questions that may be submitted to a vote of the electors of a municipality "at an election, as that term is defined in [General Statutes §] 9-1 . . . ." Section 9-1 (d) defines "election" to mean "any electors' meeting at which the electors choose public officials by use of voting machines or by paper ballots . . . ." Finally, General Statutes § 9-369c (a) allows absentee voting at a referendum "as defined in subdivision (2)

---

[5] Public Acts 1953, No. 368, § 341, became General Statutes § 9-369 while the very next provision, § 342, governs the amendment of a charter at a special election, which would include a vote not taken on election day. The subsequently passed General Statutes § 1-1c (b) also indicates that a " 'special election' " normally includes a referendum not held on election day.

[6] There is no dispute that the May 14 vote was a "stand-alone referendum" or, as defined in General Statutes § 9-1 (n) (2), "a question or proposal which is submitted to a vote of the electors or voters, as the case may be, of a municipality at a meeting of such electors or voters, which meeting is not an election, as defined in subsection (d) of this section, and is not a town meeting. . . ." See also *Massad* v. *New London*, 43 Conn. Sup. 297, 300–302, 652 A.2d 531 (1993).

. . . of subsection (n) of section 9-1 [a stand-alone referendum]." This is a recognition by the legislature of the existence of stand-alone referenda and indicates that only one aspect of the stand-alone referendum vote has been affected by chapter 152 of the General Statutes entitled: "Referenda." The meanings of these statutory sections are sufficiently clear, with no need to consult the legislative history; *State* v. *Courchesne*, 262 Conn. 537, 577–78, 816 A.2d 562 (2003); that the stand-alone referendum is not subject to the election contest deadline of § 9-328.

The court also agrees with the defendant that requiring the application of §§ 9-369 and 9-328 to a referendum held under § 9-1 (n) (2) would impinge on home rule considerations. See *Windham Taxpayers Assn.* v. *Board of Selectmen*, 234 Conn. 513, 534, 662 A.2d 1281 (1995) (whether to hold referendum under charter provision is matter of local concern). This is an issue that concerned Judge Kelly in the case relied upon by the parties, *State* v. *Coventry*, Superior Court, judicial district of Tolland, Docket No. 30142 (September 15, 1983). There, the court held that the attorney general could not proceed in a mandamus action where the dispute involved an alleged misinterpretation of provisions of the town charter of Coventry. The court declared, citing *Caulfield* v. *Noble*, 178 Conn. 81, 90, 420 A.2d 1160 (1979): "To the extent that the authority of the attorney general is premised upon its general powers under the common law to protect the public interest, the court concludes that the exercise of such authority here is an unlawful interference in a matter of purely local concern." *State* v. *Coventry*, supra, Superior Court, Docket No. 30142.

The town claims that the failure to subject a § 9-1 (n) (2) referendum to the time deadlines of § 9-328 defeats the purpose of General Statutes § 7-192a that prohibits a town from adopting its own procedure in

an election contest. The court does not have to consider this argument here, because the Connecticut courts have always recognized the right of an aggrieved party to proceed under a declaratory judgment action pursuant to General Statutes § 52-29 to determine the validity of a stand-alone referendum. See *Atwood* v. *Regional School District No. 15*, 169 Conn. 613, 363 A.2d 1038 (1975); *Migani* v. *Orange*, Superior Court, judicial district of Ansonia-Milford, Docket No. CV 93 043523S (July 19, 1994) (*Hon. Hugh C. Curran*, judge trial referee).

Section 9-328 is part of chapter 149 of the General Statutes, which concerns election contests and has a narrow purpose. Our Supreme Court has stated that where § 9-328 does not apply, the parties may attempt relief through quo warranto or declaratory judgment. *Scheyd* v. *Bezrucik*, 205 Conn. 495, 505, 535 A.2d 793 (1987). The court concludes that in this bond referendum, a challenge on the ground of illegal voting might be brought by an aggrieved party under § 52-29 without following the provisions of § 9-328, or more particularly, the fourteen day deadline of § 9-328.

Since "[e]xtreme diligence and promptness are required in election-related matters"; *In re Contested Election*, 72 Ohio St. 3d 411, 413, 650 N.E.2d 859 (1995); the court must next consider the town's argument that the defendant may not maintain her action due to laches. Laches is a defense that may be asserted where there has been an inexcusable delay that has prejudiced a party (in this case, the town). See *Bahr Corp.* v. *O'Brion*, 146 Conn. 237, 249, 149 A.2d 691 (1959); *Ridgefield* v. *Eppoliti Realty Co.*, 71 Conn. App. 321, 333, 801 A.2d 902, cert. denied, 261 Conn. 933, 806 A.2d 1070 (2002).

"In determining what will constitute such unreasonable delay or laches as will defeat the right to [a declara-

tory ruling],[7] regard should be had to the circumstances, if any, justifying the delay, to the nature of the case, the relief demanded, and the question whether the rights of the defendant, other persons, or the public as public corporations, have been prejudiced by the delay." *State ex rel. Burton* v. *Princeton*, 235 Ind. 467, 470–71, 134 N.E.2d 692 (1956). In the context of an election case, the Supreme Court of Arizona stated: " 'We emphasize that laches may not be imputed to a party for mere delay in the assertion of a claim. Rather, the delay must be unreasonable under the circumstances, including the party's knowledge of his or her right, and it must be shown that any change in the circumstances caused by the delay has resulted in prejudice to the other party sufficient to justify denial of relief.' " *Mathieu* v. *Mahoney*, 174 Ariz. 456, 459, 851 P.2d 81 (1993), quoting *Flynn* v. *Rogers*, 172 Ariz. 62, 66, 834 P.2d 148 (1992).

The defendant visited her attorney on September 16, 2002, and her attorney immediately contacted then bond counsel S. Frank D'Ercole. He also wrote a letter three days later. She did not bring suit, however, until she filed a counterclaim to the town's declaratory judg-

---

[7] "[Laches . . . is an equitable defense allowed at the discretion of the trial court in cases brought in equity." (Internal quotation marks omitted.) *John H. Kolb & Sons, Inc.* v. *G & L Excavating, Inc.*, 76 Conn. App. 599, 613, 821 A.2d 774, cert. denied, 264 Conn. 919, 828 A.2d 617 (2003). Although Connecticut's appellate courts have not expressly addressed the issue, courts in other jurisdictions have disallowed a laches defense in a declaratory judgment action. See, e.g., *Jones* v. *Douglas County*, 262 Ga. 317, 320, 418 S.E.2d 19 (1992) ("[l]aches is an equitable doctrine not applicable in a petition for declaratory judgment, which is an action at law"). Nevertheless, courts in general have increasingly applied laches in legal actions, especially in " 'equity-like' actions such as mandamus and to quasi-equitable suits." 27A Am. Jur. 2d 626, Equity §§ 149-150 (1996); see, e.g., *Maksym* v. *Loesch*, 937 F.2d 1237, 1248 (7th Cir. 1991) (stating that under Illinois law, while laches is unavailable in suits seeking money damages, it applies "to sui generis procedures such as mandamus, which are equity-like in being orders to do or not do rather than orders to pay"). Since the ultimate remedy sought by the defendant (to declare the referendum and the approval of the issuance of the bonds null and void) is akin to that of an injunction, and is quasi-equitable in nature, laches is properly raised here by the town.

ment action on December 24, 2002. She contends that her knowledge of her rights must date from her meeting with her attorney, and from that point a legal protest was swiftly pursued. She further argues that the cause of the delay in remedying the alleged illegal voting was the fault of the town in not specifically sending D'Ercole the tally sheet from the night of the referendum. It is argued that with this tally sheet, D'Ercole would have required a new referendum to be held, before the town acted on its victory at the polls.

On the other hand, the defendant, according to her affidavit, participated in town meetings held prior to the referendum relating to the need for school construction and holding the referendum itself. She was active with the group petitioning the town clerk to hold a repeal referendum. Any person entering the polling place would have known that taxpayers were voting at a separate table, and the moderator's return and the tally sheet which indicated this were filed with the town clerk on the night of the referendum. She told her attorney about the alleged voting improprieties at the meeting that she had with him on September 16. Thus, there is no justification for the defendant's delay in seeking legal counsel to advise her as late as September and certainly no justification for her counterclaim to have been filed as late as December 24. See *Save Our Schools of Bladen County* v. *Bladen County Board of Education*, 140 N.C. App. 233, 237, 535 S.E.2d 906 (2000) (in determining laches, ample evidence that plaintiff was aware of controversy and waited six months to contest bond referendum); *State ex rel. Demaline* v. *Cuyahoga County Board of Elections*, 90 Ohio St. 3d 523, 526, 740 N.E.2d 242 (2000) (challengers to ballot language "knew or should have known" of language but failed to raise issue timely).

The town has established its claim of prejudice. As the court in *Arkansas-Missouri Power Corp.* v. *Potosi*, 355 Mo. 356, 361, 196 S.W.2d 152 (1946), indicated, chal-

lenges to bond referenda are extremely restricted. "If it were otherwise, protracted litigation in courts of equity contesting bond elections might greatly delay and sometimes even defeat state, county, and municipal financing. The law affords other means of uncovering fraud in elections." (Internal quotation marks omitted.) See also *Matter of Schulz* v. *State*, 81 N.Y.2d 336, 347–48, 615 N.E.2d 953, 599 N.Y.S.2d 469 (1993), noting that the "profound destabilizing and prejudicial effects from delay may be decisive factors. These considerations must be examined for their impact on the [governmental body], on the operation and maintenance of orderly government, on those with whom the [government] engaged in these . . . financing transactions, and on society in general." Indeed, the town correctly points to several Connecticut statutory deadlines for challenges in court to types of bond resolutions. These deadlines do not exceed twenty days. The parties do not dispute that the bond sale was halted four months after the referendum took place, and an impediment has been placed by the defendant's counterclaim on the town's school construction program.

The defendant argues that the balance of the equities tips against the town because it continued to investigate the Route 6 site after the bond resolution passed, by conducting further environmental studies. The defendant contends that the town's actions in continuing to consider building the high school misled the voters so that they did not investigate the referendum further. Still, the defendant knew or should have known immediately after the referendum who had participated in the voting. In addition, our Supreme Court in *Thompson* v. *Orcutt*, 257 Conn. 301, 310, 777 A.2d 670 (2001), emphasized that the alleged wrong under the clean hands doctrine must apply to the "particular transaction under consideration." (Internal quotation marks omitted.) Here, the issue was the voting by taxpayers on May 14, not environmental concerns. As the town points out,

the question at the referendum was not whether to build a high school at a specific site, but whether to issue the bonds and commence the process of selecting the site for the new high school. The town was acting in good faith and not under any cloud when it proceeded to the next steps in site selection.

The leading case finding laches in a challenge to a bond referendum, *Lopp* v. *Peninsula School District*, 90 Wash. 2d 754, 585 P.2d 801 (1978), specifically applies to the present case. There, Lopp brought a mandamus action one month after a bond referendum, claiming that the ballot title was legally defective. The court held that laches applied. Id., 757, 762. Lopp had knowledge of the ballot defect, but unreasonably delayed his suit for one month. Considering the suit at this time in the present case would impair the issuance of bonds, with the loss of a favorable interest rate, and thereby delay construction.[8]

A more recent suit, *King County* v. *Taxpayers*, 133 Wash. 2d 584, 949 P.2d 1260 (1997), cert. denied, 522 U.S. 1076, 118 S. Ct. 854, 139 L. Ed. 2d 754 (1998), was also dismissed on laches grounds. The county brought the litigation to block proposed objections to the issuance of bonds to build a municipal baseball stadium, and intervenors contended that a referendum should have taken place. The county was allowed to assert laches against the intervenors. The majority rejected an argument raised by the dissent that laches might only be asserted as a defense. It also did not adopt the dissent's position, like that of the defendant here, that the county lacked "clean hands" because of its implementing actions after the referendum had been demanded. Cf. id., 612 n.14; id., 642–45 (Sanders, J., dissenting).

---

[8] While the bond sale had not taken place here, there is sufficient evidence in the record that it was imminent and that steps had been taken to issue the bonds.

On the town's second issue, the court holds that the defendant's counterclaim is barred by laches. This litigation, therefore, must terminate in favor of the town.[9] A declaratory judgment may issue that the referendum, for the reasons stated, is not subject to challenge.

---

[9] The court denies the defendant's request at the hearing on the motions to offer further evidence of her knowledge for purposes of laches. The court does not believe that further testimony will change the results in the present case, in light of the affidavit filed by the defendant in conjunction with her motion for summary judgment.